IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 34643-9-III |
| A.K.J and A.E.J. | ) | (Consolidated with |
| | ) | No. 34644-7-III) |
| Minor children under the age of eighteen | ) | |
| | ) | UNPUBLISHED OPINION |

KORSMO, J. — A father appeals the trial court's determination finding his two daughters dependent due to no parent being capable of adequately caring for the children. We affirm.

FACTS

The father, L.R., is the biological father of A.E.J. and has raised the other daughter, A.K.J., her entire life. The mother, T.J., is not a party to this appeal. The current case traces its origins back to a telephone call the father made to 911 to report an assault at his house in rural Adams County on June 13, 2016.

A deputy sheriff responded to find that one of the father's cousins had assaulted a woman. T.J., who was present at the time of the incident, fled the scene with the father's knowledge due to the fact there was an outstanding warrant for her arrest. Despite calling 911, L.R. was "very uncooperative" with the deputy and denied knowing what had

happened. He later testified that he had been in his bedroom when the fight occurred. He told everyone to leave the property and asked his mother, T.M., to come over and pick up the two children. She arrived and took the children.

Three days later, the Department of Social and Health Services (DSHS) filed the current dependency petitions as to each child. The case eventually went to a fact-finding hearing. T.J. testified that she did not live with L.R. and the children, but that he took care of the children while she was struggling with drug addiction. She believes L.R. is a good father who provides a safe home for her daughters. She testified there were no drugs in the house. She also described incidents of domestic violence by L.R. against her that had occurred "several years ago." She attributed those incidents to L.R.'s use of alcohol, but stated he had not been a drinker for years.

Following the end of T.J.'s first day of testimony, the trial judge opined that T.J. appeared under the influence because she was tired, slurred her speech, lacked "diction," and was "crying" and "emotional." At the next day of testimony, T.J. explained she had never testified in court before, found the experience "terrifying," and was extremely uncomfortable during her testimony because she is by nature a private person. She also explained she suffers from obsessive compulsive disorder (OCD) and anxiety disorder, both of which make it hard for her to engage in public speaking. T.J. denied being under the influence of drugs and alcohol while in court. She also explained she suffers from undiagnosed narcolepsy, which is why she often appears tired and has difficulty focusing.

No. 34643-9-III (consolidated with No. 34644-7-III)
*In re Dependency of A.K.J. & A.E.J.*

During testimony of a later witness, the judge interjected to opine that T.J. was "again nodding off in the open courtroom." Report of Proceedings (RP) at 193. During the court's oral ruling the trial judge declared:

> [T.J.] is obviously under the influence of methamphetamine. I made a comment about it yesterday. She came in this morning and said her behavior was due to OCD and anxiety disorder and she held it together in the morning. And then this afternoon she's sitting next to counsel visibly nodding off, leaving the courtroom, coming back. She's addicted. She admits she's addicted and she admits she's untreated. But she's absolutely under the influence of methamphetamine. She shakes her head no as she sits there today; but she is. She's addicted to methamphetamine.

RP at 251.

T.M. testified that she considered her son a good father to the children and that he would put them in daycare while he worked. She was a frequent visitor to the house and did not see any drug use. She had no concern for the children's well-being when in L.R.'s care. She thought the relationship between L.R. and T.J. was poor because he was always trying to "fix her."

The deputy who responded to the 911 call described the house as "extremely dirty" with the floor covered in dirt and grime to the point where the floor was sticky; there were food, clothes, and tools all over the house; boxes were piled everywhere. He also saw items related to drug activity (dishes with soot or ash, objects appearing burnt), but observed no drugs. In contrast, a family preservation therapist testified that he had

3

been inside the house in May 2016, and had considered it "lived in," but not unsanitary.[1]

A social worker testified that she became involved with the family on May 23, 2016. She

testified that the children had been attending school and were in good health.

L.R., age 33, testified that he had issues with alcohol in his teenage years, but had

successfully completed treatment. He still struggled with alcoholism, but alcohol no

longer was a problem for him. Alcohol had been the cause of his violence against T.J. in

the past. He admitted police had been called to the house in the past due to domestic

violence and, on one occasion, a suicide attempt. He testified that the house was kept

clean, but that it would get "a little messy" when T.J. was around.

The court issued its ruling finding both children dependent after hearing argument

from counsel. The court accepted the deputy's description of the home as unsanitary.

The court determined that the parents were "totally helpless" and could not function

without the support of one of their parents. Acknowledging that the domestic violence

incidents had been in the past, the judge nonetheless described them as "appalling" and

he stated that "such a man" could not be trusted with the care of small children in the

absence of treatment or other assurance that his anger problems had been resolved.[2]

---

[1] The therapist also described an incident where L.R. refused him entry to the house on the basis that T.J. no longer lived there. The therapist took T.J. to a hotel to work out alternative living arrangements, but L.R. appeared and convinced T.J. to return to his house.

[2] One of the incidents of violence involved L.R. smearing T.J.'s face with dog feces. In another, he made her remove her clothing and stay outside in the middle of winter.

4

No. 34643-9-III (consolidated with No. 34644-7-III)
*In re Dependency of A.K.J. & A.E.J.*

Similar to his assessment of T.J., the trial judge expressed his opinion of L.R.'s physical condition while in the courtroom:

> Now, I don't know what [L.R.'s] drug of choice is, and I know he's suffered a personal loss today, before this afternoon but he sits here on the witness stand and at counsel table and he's trembling like a leaf. It looks like withdrawal symptoms to me. He held it together for the morning but he was not able to hold it together today.
> He quit his job because he was stuff—suffering stress and I think it was a little deeper than that; but he is under the influence or withdrawing from some drug today and I find that as a fact.

RP at 252.

The written dependency orders found that the children had no parent capable of adequately caring for them such that the children were in circumstances that constituted a danger of substantial damage to their psychological or physical development. Clerk's Papers (1CP) at 106; 2CP at 101. The court entered a detailed finding of fact:

> These parents have a history of drug use, and on the court's observations of the parents' behavior during the trial, which behavior is consistent with what the court has seen over the years in people who suffer from drug addiction, the court is very concerned that these parents are untreated drug addicts. Further, the court believes it is likely that each of the parents may have been under the influence of drugs or withdrawing from drugs at the time of the hearing. [T.J.] exhibited great difficulty focusing on the proceedings, and several times (including during her testimony) appeared to fall asleep for periods of time. She was also very emotionally labile. [L.R.] presented to the court's eyes as extremely nervous and jittery, far beyond what might be expected of an individual in his circumstances, and was apparently unable to control his bodily movements. He seemed to the court to be clearly under the influence of some drug.
>
> The court concludes that neither of these parents is currently capable of caring for these children, although there is no basis to conclude that any of the parents subjected any of these children to abuse or neglect. The parents

5

exhibit an inability to maintain an appropriate environment for these children: the deputy who responded to [L.R.'s] residence on June 13, 2016 to investigate an assault testified that the house was filthy and unsanitary, inhabited by individuals known to or wanted by law enforcement, and contained indications of drug use. [T.J.] fled the house, leaving her children behind, when law enforcement arrived at the home. [L.R.] is also incapable of maintaining his child safely in his care. His mother has given him considerable assistance in caring for his child and the other child in his care, but he remains unable to parent either child adequately.

[T.J.] admitted during testimony to an extensive history of drug abuse, to continuing use of marijuana and to use of methamphetamine during her pregnancy. She testified to being in need of drug treatment. . . . [L.R.], although he did not admit to recent or current drug use, is also very likely candidate for treatment himself, and this should be explored. He is clearly in need of some kind of treatment to address his issues around anger and domestic violence: the court was appalled by his admitted past behaviors toward [T.S.] finding them to be extremely punitive, controlling and borderline sadistic.

1CP at 100-101; 2CP at 105-106.

The court ordered the children to live with T.M. and allowed L.R. to live there as well as long as he was not left alone with the children. The court found that DSHS had made reasonable efforts to provide services, and although T.J. made some use of the services, L.R. was uninterested or resistant. The court ordered L.R. to undergo a drug/alcohol evaluation or present a copy of a recent evaluation, as well as follow any recommended treatment. L.R. was also ordered to undertake a parenting class and have a domestic violence assessment. 1 CP at 104; 2CP at 109.

L.R. timely appealed to this court from both dependency orders. The two cases were consolidated and considered by a panel without argument.

ANALYIS

The sole issue in this appeal is whether substantial evidence supports the dependency orders. In particular, L.R. argues both that there are no facts that establish any risk to the children's physical or psychological development and that DSHS failed to prove that he is currently incapable of parenting them. Properly viewed, the evidence supports the veteran trial judge's assessment of the situation.

Well-settled standards govern our review. This court reviews the factual findings for substantial evidence and whether the findings support the conclusions of law. *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013). "Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true."[3] *Id.* This court does not weigh the evidence nor the credibility of any witness. *Id.* "Because the trial court has the opportunity to hear the testimony and observe the witnesses, its decision is entitled to deference." *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

This dependency petition was filed under RCW 13.34.030(6)(c), which provides that a child is dependent if there is "no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of

---

[3] This standard also has been defined to mean that the evidence "is sufficient to persuade a rational, fair-minded person that the finding is true." *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012).

substantial damage to the child's psychological or physical development." A finding of actual abuse or neglect is not necessary to find a child dependent under that subsection; the danger of harm is sufficient. *In re X.T.*, 174 Wn. App. at 737. The trial court has "broad discretion" in determining whether there exists a risk of harm. *Id.* at 738.

With respect to the question that L.R. was not capable of being a parent, the trial court specifically noted, besides apparent current drug use: (1) law enforcement being called to the home to investigate an assault, (2) the unsanitary condition of the home, (3) indications of drug use in the home, (4) the presence of fugitives in the home, and (5) the need for assistance from T.M. to provide proper care for the children. RP at 253.

The record squarely supports each of these five facts. It is undisputed that law enforcement was called to L.R.'s home due to an assault by one of his cousins; L.R. testified that he called the police for that very reason. Additionally, T.J. was the fugitive in the home, and she testified that she fled with L.R.'s knowledge while the police were on the way. The dependency petitions also indicate that L.R. attempted to assist T.J. to elude law enforcement a second time on June 14. L.R. lied to the police about T.J. not being present until she was discovered hiding in a closet within the home. These actions are indicative of extremely poor judgment on L.R.'s part. The deputy's testimony was that the home was very dirty and that there were indications of drug use.[4] The trial judge

---

[4] The trial court understandably credited these more recent observations over those made by the social workers during the month of May.

clearly deemed the deputy's testimony on this fact the most credible, and we defer to that credibility determination. *In re X.T.*, 174 Wn. App. at 737. The same is true of the deputy's testimony concerning indications of drug use in the home. Last, the testimony of T.M. and L.R. indicates that L.R. would not be able to function as a parent without T.M.'s support. All of these findings support the determination that L.R. was not currently capable of parenting the children.

The record is ambiguous whether the trial court considered L.R.'s apparent current drug use to be a factor in affecting his capacity to parent. The court stated that L.R. "besides being withdrawing from a drug or alcohol or some substance, is not capable of being a parent." RP at 253. The trial judge then listed the five facts noted in the previous two paragraphs. It appears that the court simply treated this observation of current drug usage as bearing on the need for services rather than as an additional reason for finding L.R. incapable of parenting.[5] But even if it was used as an additional reason for finding L.R. incapable of parenting, we believe the trial judge was capable of assessing whether or not L.R. was under the influence at the time he testified in court. From our earliest days, trial judges have been assigned the task of determining whether a witness is incompetent to testify due to intoxication or mental incompetency. RCW 5.60.050. *See Fox v. Territory*, 2 Wash. Terr. 297, 299, 5 P. 603 (1884). We are confident an

---

[5] 1CP at 100-101; 2CP at 105-106.

9

experienced jurist, as we have in this case, is capable of determining whether or not a witness before him was under the influence.[6]

The remaining question is whether there was a substantial danger to the development of the children. Although this is a closer call, we agree that the trial court had a basis for its finding and did not abuse its broad discretion. There is a large amount of evidence in the record that L.R. has past domestic violence issues that were never treated. Considering this past history, the violence in the home perpetrated by others (cousins of L.R.), and the indications of drug use in the home, there is more than enough evidence for the trial court to find a danger of harm to A.K.J. and A.E.J. With this in mind, the trial court's statement that it "could not trust such a man to take care of small children in the absence of some sort of treatment or some sort of assurance that he had his anger problems under control" is, despite some positive efforts by L.R., perfectly reasonable and in the best interests of A.K.J. and A.E.J. *See In re Dependency of Brown*, 149 Wn.2d 836, 841-842, 72 P.3d 757 (2003). Whatever control L.R. might or might not currently have on his anger issues, the trial court would be remiss not to investigate further in light of his failure to control others from committing acts of violence in his own house and his inability to prevent drug use, including by the children's mother, in their

---

[6] We are not suggesting that a judge's courtroom observations would constitute sufficient evidence to rule that a witness was addicted or to serve as a basis for terminating the child-parent relationship. Professional evaluation would be in order to serve those purposes. However, the court's long-held authority to determine sobriety suffices to determine whether there is a basis for finding a dependency and ordering additional services.

No. 34643-9-III (consolidated with No. 34644-7-III)
*In re Dependency of A.K.J. & A.E.J.*

home. These activities all indicate a risk of harm to the children from an unhealthy and

unsafe environment that L.R. cannot control.

Accordingly, we affirm the dependency orders.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Korsmo, J.

I CONCUR:

Lawrence-Berrey, A.C.J.

11

No. 34643-9-III (consolidated with No. 34644-7-III)

LAWRENCE-BERREY, A.C.J. (concurring) —Through various legislative enactments, trial courts are tasked with protecting vulnerable adults and children. Whether the case involves children with divorcing parents, victims of domestic violence, vulnerable adults, dependency determinations, parental terminations, or a host of other enactments, a trial court's assessment of credible danger authorizes it to protect vulnerable persons from possible violence and harm.

Here, the trial court had the opportunity to observe L.R. throughout a multiday hearing. The trial court's observations caused it to believe that L.R. was under the influence of drugs or withdrawing from drugs. Its belief was based on obvious signs that permitted no other credible explanation.

The dissent asserts, "[w]hen a judge takes on the role of an opinion witness, the litigant's fair hearing rights are undermined." (Dissent at 2). Although theoretically possible, that is not the case here. Here, the trial court's opinion was based on obvious signs likely noted by all courtroom participants. Also, if the trial court's opinion was wrong, L.R. could have taken a drug test and submitted the results with a motion for reconsideration. He did not. L.R.'s right to a fair hearing was not undermined here.

I commend the trial court for noting its observations on the record and making a decision that protects the children. The trial court's order requires L.R. to obtain a drug

assessment and follow the recommendations of the treatment provider. If L.R. suffers

from drug addiction, the trial court's order not only protects the children, it results in

treatment for L.R.'s addiction, thus leading to a better outcome for L.R. and his children.

Lawrence-Berrey, A.C.J.

No. 34643-9-III (consolidated with No. 34644-7-III)

PENNELL, J. (dissenting) — L.R. lost custody of his children based, at least in part, on the trial court's assessment that L.R. was either under the influence of drugs or withdrawing from drug use. Although no party or witness alleged L.R. had ever used drugs, the judge presiding over a dependency hearing for L.R.'s children, A.K.J. and A.E.J., determined L.R. must have been using drugs based on L.R.'s demeanor in court. In making this substantive assessment, the judge took on the role of a witness. Because this was improper, I would reverse the order of dependency.

The judge's evaluation of L.R. was not akin to declaring a witness incompetent to testify under RCW 5.60.050. Excluding a witness based on intoxication is an evidentiary ruling. It has no substantive value. *See* 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 1.02, at 24 (6th ed. 2012). The trial judge could have stricken L.R.'s testimony based on intoxication. Or the court could have made an adverse credibility determination. But the court should not have made substantive findings about L.R.'s intoxication based on the judge's own personal experiences and expertise. When the intoxication is relevant for substantive reasons, as opposed to merely impeachment or competency, it must be supported by competent evidence. Typically, intoxication evidence is admitted through lay or expert testimony. *See United States v. Horn*, 185 F.Supp.2d 530, 559-60 (D. Maryland 2002) (collecting cases). Such

testimony affords a litigant due process through protections such as the rights of discovery, cross-examination, and appellate review. When a judge takes on the role of an opinion witness, the litigant's fair hearing rights are undermined.

Contrary to the majority's assessment, I believe the judge's findings on drug use were material to the dependency determination. The judge began his oral ruling by commenting that it felt like he was "holding court in an icehouse." 1 Report of Proceedings (Aug. 3, 2016) at 251. This was not a reference to the room temperature.[1] The judge's concerns about drug use permeated the court's rulings, both oral and written. The repeated reference to L.R.'s alleged drug use leaves the impression that drug use was of great concern to the court, if not the primary factor behind the court's dependency finding.

This is not a case where the evidence against the father was overwhelming. A.K.J. and A.E.J.'s mother and grandmother both testified that L.R. was a good father. The uncontested evidence was that domestic violence between L.R. and the children's mother had only been a problem in the past. Although a sheriff's deputy had claimed L.R.'s house was filthy, a service provider who had been to the home on several occasions testified he had never noticed anything unsanitary or potentially dangerous to children on the premises.

---

[1] Ice is a street name for crystal methamphetamine.

No. 34643-9-III; 34644-7-III
*In re Dependency of A.K.J. & A.E.J.* (dissent)

Given the weight the judge placed on his assessment of L.R.'s drug use in the ultimate dependency decision, I would reverse the dependency order. The fact that this was a dependency hearing, as opposed to a termination of parental rights trial, should not color our assessment of whether the judge improperly assumed the role of an opinion witness. While parental rights trials are governed by a higher standard of proof than dependency proceedings, *compare* RCW 13.34.190(1)(a) *with* RCW 13.34.110(1), both contexts demand competent evidence. *See In re Welfare of Ross*, 45 Wn.2d 654, 655-56, 227 P.2d 335 (1954); RCW 13.34.110(1). Furthermore, a dependency order marks the first step in the statutory process required to terminate parental rights. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 579, 257 P.3d 522 (2011). Once an order is entered, the State gains access to a family's private affairs. Children's lives are disrupted and their futures are placed in limbo. Meaningful appellate review is just as important in the dependency context as it is with respect to the termination of parental rights. We should exercise this review to reverse the trial court's dependency order.

_____
Pennell, J.

3